*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1549**

In re the Marriage of:
Christophe Traore Dit Labarere,
petitioner,
Respondent,

vs.

Fatima Lakehal,
Appellant

**Filed August 10, 2015
Affirmed in part and reversed in part
Ross, Judge**

Dakota County District Court
File No. 19AV-FA-12-2687

Laurie A. Cylkowski, Ellen M. Windler, Cylkowski Law Office, P.A., Eagan, Minnesota (for respondent)

Jay A. Tentinger, Tentinger Law Firm, Apple Valley, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Peterson, Judge; and Johnson, Judge

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

Divorcing parents dispute child custody. Christophe Traore Dit Labarere and Fatima Lakehal agreed that the district court could dissolve their marriage, and they agreed to permanent joint legal custody of their two daughters. The district court

incorporated this agreement into an order it issued before trial. After Lakehal expressed her dissatisfaction with this stipulation during trial, the district court found that she had repudiated the agreement and granted Traore sole legal custody. It also awarded Traore sole physical custody, mandated that Lakehal's parenting time be supervised, and awarded Traore conduct-based attorney fees. Because the district court decided legal custody without having sufficiently notified the parties that it would reconsider the issue, we reverse the legal-custody decision and reinstate the previously ordered and stipulated joint-legal-custody arrangement. But because we are not persuaded by Lakehal's arguments urging us to reverse the district court's decisions as to sole physical custody, supervised parenting time, and attorney fees, we otherwise affirm.

**FACTS**

Christophe Traore Dit Labarere and Fatima Lakehal were married in November 2002 in France. They moved to the United States, where their two daughters were born in February 2008 and March 2011. Traore served Lakehal with a dissolution petition in August 2012, seeking sole legal and physical custody of the girls. Lakehal responded also seeking sole custody.

Not long after the preliminary dissolution filings, Lakehal was hospitalized from October to December 2012. She had engaged in an extreme Ramadan fast that so weakened her body that she could not walk. She was hospitalized weighing only 98 pounds and was diagnosed with "[m]ajor depressive disorder, recurrent, severe with psychosis." She refused to consent to a feeding tube and agreed to psychiatric treatment

2

only after civil commitment proceedings were initiated. She was released with instructions to continue medical and psychiatric treatment with medication.

The district court addressed competing temporary-relief motions in March 2013. The parties stipulated to joint legal custody, based on which the district court ordered, "The parties are granted the permanent joint legal custody of their minor children." They had also stipulated to a temporary "nesting" schedule, in which the children would remain at home with each parent alternately residing there for equal amounts of time. The parties did not stipulate to the issue of physical custody, which the court reserved pending the completion of a custody evaluation.

Dr. Michelle Millenacker conducted that evaluation, interviewing each parent and visiting the home. Lakehal told Dr. Millenacker that she wanted sole physical custody because she was the "primary parent" and "Traore never took care of the girls or was involved in their care until she was hospitalized." Traore also requested sole physical custody, but he expressed that it was "not his intent to take the children away from their mother but to make sure that she is mentally and physically stable . . . and that the children will be safe with her." Dr. Millenacker recommended joint legal and physical custody. The parties met for three early neutral evaluation sessions, but that process did not result in their written agreement about physical custody or parenting time.

The district court held a trial primarily on the reserved issue of *physical* custody. During trial, however, Lakehal expressed regret over her agreement for joint *legal* custody:

> Question: And as part of that hearing legal custody was, on a permanent basis, was agreed to?
> Answer: Yes, somewhat. Yes.
> Question: What do you mean by somewhat?
> Answer: So --
> Question: I'm talking about legal custody.
> Answer: Yeah, I guess, you know. It's just difficult for me to agree to anything since we are not able to communicate. I guess we spent so much time in mediation and stuff like that, you know, at some point the judge ordered something . . . .

She later elaborated that:

> We didn't make any agreement on custody, except on sole legal custody. And even at that time, I don't know why I -- I don't even think I agreed to it because me and Christophe don't agree on religion, don't agree on education, don't agree on medical care of the kids. Even that shouldn't have been agreeable.

When Lakehal indicated that she disagreed with Dr. Millenacker's recommendation of joint physical custody, she stated that she also "wish[ed] that [she] could request sole legal custody as well."

Traore changed his position during trial too, but only as to physical custody. Although he had requested joint physical custody at the start of trial, during trial he requested sole physical custody because he believed that Lakehal's behavior during the trial, which extended over several months, had indicated her mental instability.

Lakehal testified about her mental health and her belief about voodoo. She said that she was not experiencing symptoms of depression and that she was not prescribed any medication. She testified about "black magic," saying that her father was involved with it and that his girlfriend killed her mother using witchcraft. Lakehal, who is Muslim, stated that she had become very religious eight years before the trial. She had visited a

4

psychic to protect her mother. According to Lakehal, God then soon killed eleven people in her father's girlfriend's family on account of Lakehal's deep spirituality:

> And I believe that if God took 11 people in six weeks, because I was praying, praying so much to protect me, protect my mother, protect my kids, it's because God was here and listening. It's very difficult for someone that have not high spiritual level. But, God cannot kill 11 people in six weeks in the same family of witchcraft.

She also claimed that a ring Traore wore protected him from black magic. Traore denied that the ring had anything to do with black magic and stated that this was the first time he heard Lakehal assert that it did.

The district court found that Lakehal had "repudiated this [joint legal custody] agreement at trial." It found her mental-health issues "very concerning." It determined that it was in the children's best interests for Traore to be awarded sole legal and physical custody and that Lakehal's parenting time be supervised until she completed psychological testing. The district court awarded Traore $30,000 in conduct-based attorney fees because it determined that Lakehal's "conduct . . . increased [the] length and expense of this proceeding." Lakehal unsuccessfully moved the district court to amend the findings and judgment or grant a new trial.

Lakehal appeals.

## D E C I S I O N

Lakehal contends that the district court abused its discretion by awarding Traore sole legal and physical custody. She also asks this court to reverse the district court's

decision imposing supervised parenting time and awarding Traore conduct-based attorney fees. We address each issue in turn.

## I

Lakehal argues that the district court erroneously awarded Traore sole legal custody after the parties stipulated to permanent joint legal custody and the court had adopted that stipulation in its 2013 order for temporary relief. The argument is well founded.

The record supports Lakehal's position that she lacked notice that the district court would decide the issue of legal custody in its judgment and decree. The parties in a dissolution proceeding have a right to due process, which requires "notice, a timely opportunity for a hearing, the right to be represented by counsel, an opportunity to present evidence and argument, the right to an impartial decision maker, and the right to a reasonable decision based solely on the record." *In re Marriage of Sammons*, 642 N.W.2d 450, 457 (Minn. App. 2002) (quotation omitted); *see also Halverson ex rel. Halverson v. Taflin*, 617 N.W.2d 448, 451 (Minn. App. 2000) ("The failure to grant a parent an opportunity to be heard on custody issues is a denial of . . . due process."). The district court acknowledged the stipulation in its order, but it determined that Lakehal had repudiated the stipulation at trial. We consider whether this determination is accurate and sufficient for notice.

The record supports Lakehal's assertion that neither party had notice that the district court would consider legal custody. Traore does not claim that the trial record shows us when the district court indicated that it would address legal custody. At oral

argument, his counsel represented that an off-the-record conversation between the district court judge and the attorneys occurred, during which the repudiation and notice may have occurred. But the parties have not sought to supplement the record on appeal, *see* Minn. R. Civ. App. P. 110.05, and Lakehal does not concede that the off-record discussion occurred as Traore's counsel now represents. The district court did not suggest that it made its determination based on an off-record discussion, but that Lakehal "repudiated this agreement at trial."

We do not consider Traore's unsupported representation about an off-record notice discussion, and we do not believe that the trial record supports the finding that Lakehal repudiated the joint-legal-custody agreement. Lakehal argued during trial for sole physical custody, not sole legal custody. It is true that she expressed her dissatisfaction and even regret over the legal-custody stipulation, but she never asked the court to change the extant legal-custody order. Given her express dissatisfaction about the agreement, the district court had ample ground to suspect that she might want to repudiate the agreement. On that suspicion it could have inquired whether she intended to repudiate the agreement, inquired about Traore's position about the repudiation, and notified the parties of its intent to address legal custody because of the repudiation, offering them the opportunity to present any evidence and be heard on the question of legal custody. This did not occur.

Traore maintains that the 2013 order for temporary relief provided Lakehal notice that the district court may decide the issue of legal custody despite the stipulation. He points to the "Notice" section that lists various rights each party has in relation to the

7

minor children. These rights include access to copies of informational records about the children, access to the children's health and dental insurance information, and reasonable contact with the children. After listing these rights, the notice reads, "The Court may waive any rights under this section if it finds it necessary to protect the welfare of a party or the child," citing Minnesota Statutes section 518.17, subdivision 3. Traore argues that, in context, this final sentence informed Lakehal that the district court may reject the stipulation. The argument overreaches. The sentence specifies its scope, which is the "rights under this section." Those rights were listed, and none involves legal custody. The statute cited in support of the sentence also identifies the same rights just listed. *See* Minn. Stat. § 518.17, subd. 3(b)(1), (2), (7) (2014). The "Notice" section did not give the parties notice that the district court would reconsider its order of "permanent joint legal custody."

Because the district court did not give the parties notice that it was deciding legal custody, it did not satisfy the parties' due process rights. It therefore decided legal custody prematurely. The 2013 order assigning joint legal custody should have remained in force until the parties were heard on the issue of legal custody. We reverse the award of sole legal custody to Traore and reinstate joint legal custody between the parties based on the order purportedly assigning permanent legal custody. Although this order was not a final judgment and decree resolving all aspects of the dissolution as required by Minnesota Rule of Civil Procedure 54.02, neither party argued the impact of this rule to the district court and that issue is not properly before us now. Nor are we reaching the merits of the legal custody determination. Nothing in this opinion precludes either party

from seeking to modify custody. We hold only that the lack of notice under the circumstances requires us to reverse the order as to legal custody.

## II

Lakehal challenges the district court's determination that it is in the children's best interests for Traore to be assigned sole physical custody. Our primary objective in child-custody disputes is to advance the children's best interests. *In re Child of Evenson*, 729 N.W.2d 632, 636 (Minn. App. 2007), *review denied* (Minn. June 19, 2007); *see also* Minn. Stat. § 518.17 (2014). The law "leaves scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations." *Vangsness v. Vangsness*, 607 N.W.2d 468, 477 (Minn. App. 2000). We ask only whether the district court abused its discretion by making findings that lack evidentiary support or by improperly applying the law. *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn. 1985).

The district court analyzed the statutory best-interest factors and determined that six of the factors weighed in Traore's favor. Two of them were substantially contested.

The parties mostly disputed who served the primary-caretaker role. The district court found that Traore was the primary caretaker. The finding is sufficiently supported by evidence. Traore took the girls to and from daycare every day, and he often cared for them alone until 7:00 or 8:00 at night because Lakehal worked late. Although Lakehal claimed that she "was like a single mom already" and took care of the children the "whole time," the district court considered evidence that was inconsistent with these assertions and found them incredible. On appeal, we do not reweigh conflicting evidence or remake credibility findings, which are matters in the exclusive province of the district

court as fact finder. *Gada v. Dedefo*, 684 N.W.2d 512, 514 (Minn. App. 2004). Because the district court's finding is supported by facts in the record, the finding stands.

The district court also expressed concern regarding Lakehal's mental health and found that this weighed in favor of Traore's sole physical custody as well. The court considered Lakehal's recent hospitalization and her observable behavior throughout the trial. Although her stated belief in "black magic" and "voodoo" might be a matter of her protected right to exercise religion freely, the district court considered whether the expression of her beliefs included a mental-illness component as it bears on the children. We cannot say that the consideration in this case was improper. The evidence indicated that Lakehal's religious beliefs were entwined in her extreme fasting to the point of her inability to care for herself or her children and to her being hospitalized and diagnosed with psychosis. Her testimony was peppered with references to voodoo in areas where the district court reasonably questioned the relevance to the issues under discussion. The district court found that "[h]er beliefs and actions are not consistent with mental wellness" and that she "lacks any insight into her mental health issues." The district court's concerns about Lakehal's mental health and its potential danger to the children appear to be well-founded, and the court did not abuse its discretion by considering these circumstances in favor of assigning sole physical custody to Traore.

The district court's other best-interest conclusions are also supported by the record and properly based on the law. The district court considered each factor thoroughly, and, given its broad discretion, we have no ground to reverse its sole-custody decision.

10

## III

Lakehal asks us to reverse the supervisory restriction on her parenting time. The district court ordered Lakehal to undergo "psychological and psychiatric evaluations by experts approved by the Court" and restricted her to supervised parenting time until those evaluations are completed. Like custody, the district court has "extensive discretion" in making parenting-time decisions. *Gregory v. Gregory*, 408 N.W.2d 695, 697 (Minn. App. 1987). And a district court must restrict parenting time "if the court finds, after a hearing, that parenting time with a parent is likely to endanger the child's physical or emotional health or impair the child's emotional development." Minn. Stat. § 518.175, subd. 1(b) (2014). A district court must make particularized findings regarding the reasons for a restriction and how the restriction is in the children's best interests. *See Courey v. Courey*, 524 N.W.2d 469, 472 (Minn. App. 1994).

Traore concedes that the district court did not make an explicit finding of likely endangerment, but he argues that such a finding is amply supported by the record. We agree. Where the district court fails to make a finding of likely endangerment, we need not reverse if the district court's order as a whole would support the finding. *See, e.g.*, *Gregory*, 408 N.W.2d at 698. After observing Lakehal throughout six days of trial, which was spread out over a three-month span, and hearing testimony about her mental-health issues, the district court found that her "behavior and testimony during the trial are not consistent with a diagnosis of good mental health." The court further found that Lakehal lacked any insight into her mental-health issues and described Traore's "legitimate" concerns that if Lakehal's "mental health issues accelerate, and she is unable or unwilling

11

to understand this is happening, her inability to care for herself will also cause an inability to care for the children." The district court therefore mandated, "For the safety of the children, [Lakehal's] parenting time should be supervised by a professional parenting time supervisor."

The district court's findings regarding Lakehal's mental health are supported by evidence in the record. Lakehal had previously allowed her mental health to deteriorate to the point of being unable to care for herself or her children. She underwent treatment for her depression, but at the time of trial she was no longer receiving any therapy or other treatment. Her trial testimony was scattered and the district court reasonably summarized that she "repeatedly launched off on repetitive diatribes regarding alleged infidelity on the part of [Traore], safety gates, voodoo, missing photographs and other topics." After observing Lakehal on the stand, Traore testified:

> Hearing her testimony, I still believe she's the same -- I don't know, it's the same pattern I've been seeing for years, since 2009, is still there. And, therefore, I don't know what to believe now, if she's really well or if she's, you know, just trying to make us believe she is well. Now I have a doubt. I don't think she is well.

The record supports the finding that Lakehal may continue to suffer from the kind of mental-health condition that rendered her unable to care for the children in the past and that may endanger them in her unsupervised care. The district court did not abuse its discretion by ordering Lakehal to complete mental-health evaluations before she may exercise unsupervised parenting time.

12

**IV**

Lakehal also challenges the district court's award to Traore of $30,000 in conduct-based attorney fees. A district court has the discretion to award attorney fees against a party "who unreasonably contributes to the length or expense of the proceeding," Minn. Stat. § 518.14, subd. 1 (2014). The party moving for conduct-based fees has the burden to establish that the adverse party's conduct during the litigation process justifies an award. *Geske v. Marcolina*, 624 N.W.2d 813, 818–19 (Minn. App. 2001). Lakehal does not apparently contest any of the district court's fact findings that underlie the conduct-based fee award. She argues only that the findings are not sufficient to establish that she unreasonably contributed to the length or expense of the proceeding. The argument does not convince us to reverse.

In support of its award of conduct-based fees, the district court found:

> Respondent has unreasonably contributed to the length and expense of this proceeding. The three ENE sessions were a waste of time. The parties' assets and liabilities were readily quantifiable. There were no premarital or nonmarital issues. [Traore's] counsel began sending spread sheets and settlement proposals regarding the property issues to [Lakehal's] counsel in January 2013. [Lakehal's] refusal during the trial to stay on point turned what should have been no more than a two day trial into a six day trial.

Traore documented that he incurred approximately $50,000 in attorney fees throughout this litigation. Since September 2013, when Dr. Millenacker issued her custody evaluation, he incurred $31,527 in fees. The district court traced the fees that Traore incurred after the custody evaluation to Lakehal's conduct because Lakehal unreasonably "rejected the physical custody recommendations of the expert selected by the parties;

13

hired Dr. Shea to critique Dr. Millenacker's report, causing increased fees to [Traore] in reviewing the critique and questioning Dr. Shea at trial; and extensive but necessary trial preparation and the trial itself." The court also observed that the first day of the six-day trial was "wasted" because Lakehal took unreasonable positions on the division of assets.

We have reviewed the record and the findings, and we hold that the findings adequately support the district court's determination. We affirm the district court's attorney-fee award.

**Affirmed in part and reversed in part.**